# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

STAND UP FOR CALIFORNIA!
P.O. Box 355
Penryn, California 95663,

PATTY JOHNSON
8713 Tulare Ct.
Elk Grove, CA 95758,

JOE TEIXEIRA
8217 Wooded Brook Drive
Elk Grove, CA 95758,

and

LYNN WHEAT
8770 Williamson Drive
Elk Grove, CA 95624,

        Plaintiffs,

   v.

UNITED STATES DEPARTMENT OF INTERIOR
1849 C Street, N.W.
Washington, D.C. 20240,

SALLY JEWELL, in her official capacity as Secretary
of the Interior
1849 C Street, N.W.
Washington, D.C. 20240,

BUREAU OF INDIAN AFFAIRS,
1849 C Street, N.W.
Washington, D.C. 20240,

LARRY ROBERTS, in his official capacity as Acting
Assistant Secretary-Indian Affairs
1849 C Street, N.W.
Washington, D.C. 20240,

and

AMY DUTSCHKE, in her official capacity as
Regional Director Bureau of Indian Affairs
2800 Cottage Way
Sacramento, California 95825,

        Defendants.

Civil Action No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      This case challenges a regulation promulgated by Defendants that eliminates the ability of aggrieved parties to seek and the power of federal courts to grant preliminary injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 705. In cases involving the acquisition of land in trust for tribes under Section 5 of the Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C. § 465,[1] Departmental regulations now require the Assistant Secretary–Indian Affairs to accept title to land in trust for an Indian tribe "immediately" upon the Secretary or Assistant Secretary making the underlying trust decision, regardless of whether doing so will cause irreparable harm. *See* 25 C.F.R. § 151.12(c). By requiring the Assistant Secretary to "[i]mmediately acquire the land in trust," 25 C.F.R. § 151.12(c) prevents courts from exercising their power to "postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings," 5 U.S.C. § 705. Not only that, Defendants have apparently interpreted the regulation to negate *their own authority* under 5 U.S.C. § 705 to postpone the effective date of a decision if "justice so requires."

2.      Plaintiffs challenge 25 C.F.R. § 151.12(c) on an emergency basis *before* Defendants issue a decision to acquire an approximately 36-acre parcel of land located in Elk Grove, California ("Casino Site") for the Wilton Rancheria so that the Rancheria can construct a casino, hotel, and parking structure because Defendants have refused to delay the acceptance of title long enough after making the trust decision for Plaintiffs to seek a stay from this Court under 5 U.S.C. § 705. The Casino Site is encumbered under State and local law, and Plaintiffs have claims arising under the California Environmental Quality Act ("CEQA"), *Stand Up California!, et al. v. City of Elk Grove, et al.*, No. 32-2016-80002493 (Cal. Super. Ct. Nov. 23,

---

[1] All statutory references are to the 2012 edition of the United States Code. In the next edition of the United States Code, the Indian Reorganization Act will be reclassified as 25 U.S.C. § 5101 *et seq*., and Section 465 will appear at 25 U.S.C. § 5108.

2016), which is pending in State court. In addition, more than 14,000 citizens in Elk Grove—including the individual Plaintiffs—petitioned to referend an ordinance the City of Elk Grove adopted to remove encumbrances on the Casino Site. The City verified the petition on January 6, 2017 and acknowledged that its ordinance is not in effect.

3.      Defendants are fully aware that by "immediately acquir[ing]" title to the Casino Site in trust the same day they issue the underlying trust decision, they will eliminate State jurisdiction over the land, mooting Plaintiffs' State law rights. They also know that the Court cannot order the State of California to reinstate a referendum or a California court to revive a CEQA suit.  Their refusal to accommodate Plaintiffs' reasonable request that they delay acquisition of title long enough for Plaintiffs to seek judicial relief under 5 U.S.C. § 705 only underscores the obvious purpose of 25 C.F.R. § 151.12(c)—to limit the ability of this Court to grant aggrieved parties complete relief and to make challenges to trust decisions far more difficult to maintain.

4.      Section 151.12(c), and Defendants' impermissible interpretation of it, squarely conflicts with 5 U.S.C. § 705 and implicates the same nondelegation doctrine concerns the Eighth Circuit identified the last time Defendants tried to insulate their trust decisions from judicial review. *State of South Dakota v. U.S. Dep't of the Interior*, 69 F.3d 878 (8th Cir.), *vacated*, 69 F.3d 878 (1995). The Court should vacate 25 C.F.R. § 151.12(c) as arbitrary, capricious and not in accordance with law. *See* 5 U.S.C. § 706(2).

## PARTIES

5.      Plaintiff Stand up for California! ("Stand Up") is a California non-profit, public service corporation with a focus on gambling issues affecting California. Since 1996, Stand Up has worked with individuals, community groups, elected officials, members of law enforcement, local public entities, the State of California and state and federal policy makers on matters related to gaming. Stand Up has supporters throughout California, including some residing in the Elk Grove area that will be affected by the environmental and economic impacts of the Wilton Rancheria's proposed trust acquisition and tribal casino, which Stand Up anticipates will be

approved as soon as January 16, 2017. More immediately, the immediate acceptance of title to the Casino Site by Defendants the same day Defendants issue a trust decision will moot claims Stand Up has pending under CEQA against the City of Elk Grove in California Superior Court.

6.      Plaintiffs Patty Johnson, Joe Teixeira, and Lynn Wheat are individuals who reside in Elk Grove, California. They will be affected by the decision to acquire land in trust and the environmental impacts of the proposed casino. More immediately, the immediate acceptance of title to the Casino Site by Defendants the same day Defendants issue a trust decision will moot claims Patty Johnson and Joe Teixeira have pending under CEQA against the City of Elk Grove in California Superior Court.

7.      Defendant Department of the Interior ("Interior") is a department of the United States government, which was established by Congress and which exercises authority pursuant to congressional enactments. Interior is charged with responsibility for managing and administering lands of Indian tribes and for managing and administering federal programs related to Indian tribes.

8.      Defendant Sally Jewel is the Secretary of the Interior ("Secretary"), and in that capacity is responsible for overseeing and managing all programs, activities, and operations of Interior relating to Indian lands and affairs. She is sued in her official capacity only. The Secretary has authority to promulgate regulations necessary to acquire lands in trust for Indian tribes under Section 5 of the IRA, 25 U.S.C. § 465 and 25 U.S.C. §§ 1a, 2, 9. The Secretary has delegated this authority to the Assistant Secretary-Indian Affairs by part 209 of the Departmental Manual.

9.      Defendant Bureau of Indian Affairs ("BIA") is a federal agency within Interior and is responsible for overseeing and managing all programs, activities, and operations of the Interior relating to Indian lands and affairs.

10.      Defendant Larry Roberts is the Acting Assistant Secretary–Indian Affairs ("Assistant Secretary") and is responsible for overseeing and managing all programs, activities, and operations of BIA. The Assistant Secretary has delegated authority from the Secretary to

promulgate regulations necessary to acquire lands in trust for Indian tribes under the IRA by part 209 of the Departmental Manual. He is sued in his official capacity only.

11.     Defendant Amy Dutschke is the Regional Director of BIA's Pacific Regional Office and is responsible for overseeing the transfer of title to land into trust for applications within the jurisdiction of the Pacific Regional Office. The Regional Director is responsible for overseeing the transfer of title to land into trust for lands located within her jurisdiction. She is sued in her official capacity only.

12.     Interior and BIA are agencies within the meaning of the APA, 5 U.S.C. § 701(b)(1).

## JURISDICTION AND VENUE

13.     The Court has both subject matter and personal jurisdiction under 28 U.S.C. § 1331; the APA, 5 U.S.C. §§ 702, 706; and 28 U.S.C. §§ 1361, 1651, 2201–2202; and this Court's equitable powers. The matter in controversy arises under the regulations implementing Section 5 of the IRA, 25 U.S.C. § 465—specifically, 25 C.F.R. § 151.12(c).

14.     Venue is proper in the federal district court for the District of Columbia under 28 U.S.C. § 1391(b) and (e)(2) because the United States, one of its agencies, and one of its officers in her official capacity are Defendants and a substantial part of the events affected by the litigation is related to this district.

15.     The United States waived sovereign immunity from suit under 5 U.S.C. § 702.

16.     Defendants' issuance of the 2013 revision to 25 C.F.R. § 151.12(c) constitutes final agency action. Stand Up exhausted its available remedies by challenging the regulation when it was a proposed rule.

17.     There is an actual controversy between the parties arising from Defendants' decision to promulgate 25 C.F.R. § 151.12(c), compliance with which strips Plaintiffs of their rights and this Court the opportunity to accord relief under 5 U.S.C. § 705.

## STATEMENT OF FACTS

**A.      History of 25 C.F.R. § 151.12(c)**

18.      In 2012, the Supreme Court held that the Quiet Title Act, 86 Stat. 1176, does not bar challenges arising under the APA to a federal decision to acquire land in trust for a tribe under Section 5 of the IRA, 25 U.S.C. § 465. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199 (2012). That is so because a challenge under the APA is not predicated on a property interest; rather, it is a challenge to the Secretary's compliance with applicable federal statutes. *Id.* at 2207-08.

19.      Prior to the Supreme Court's decision in *Patchak*, the Secretary maintained that once land was acquired in trust, the Quiet Title Act barred judicial review because the Act expressly excludes "trust or restricted Indian lands" from the United States' waiver of sovereign immunity, 28 U.S.C. § 2409a. *See, e.g., Neighbors for Rational Dev., Inc. v. Norton*, 379 F.3d 956 (10th Cir. 2004); *Metropolitan Water Dist. of S. Cal. v. United States*, 830 F.2d 139 (9th Cir. 1987); *Florida Dep't of Bus. Regulation v. Dep't of the Interior*, 768 F.2d 1248 (11th Cir. 1985).

20.      Because of this view, the Secretary promulgated 25 C.F.R. § 151.12(b) in 1996, which established a 30-day waiting period following publication of a notice of decision to acquire land in trust for a tribe specifically to ensure aggrieved parties the opportunity for judicial review of administrative decisions to acquire title to lands in trust for Indian tribes and individual Indians. *See* 61 Fed. Reg. 18082 (Apr. 24, 1996). The purpose of the 30-day waiting period was to provide a window of time in which interested parties had the opportunity to seek judicial review under the APA—as the APA itself contemplates— before the Secretary acquired title to land in trust, action which, under the Secretary's view at the time, would insulate the decision from further judicial review. *Id.* If someone filed suit during that period, BIA would voluntarily stay the transfer to provide opportunity for judicial review as a matter of policy.

21.      The Secretary promulgated 25 C.F.R. § 151.12(b) only after the Supreme Court granted certiorari to review an Eighth Circuit decision holding that Section 5 of the IRA violated the nondelegation doctrine by providing no legislative standards governing Secretary's

acquisition. *Dep't of Interior v. S. Dakota*, 519 U.S. 919 (1996), *vacating State of South Dakota v. U.S. Dep't of the Interior*, 69 F.3d 878 (8th Cir. 1995).   The commitment to provide the opportunity for judicial review prompted the Supreme Court to vacate the Eighth Circuit's decision.

22.     After the Supreme Court held in *Patchak* that the Quiet Title Act did not, in fact, bar challenges arising under the APA to decisions to acquire land in trust for tribes, the Secretary revoked the 30-day waiting period in 25 C.F.R. § 151.12(b) and replaced it with the regulation challenged here.  *See* Land Acquisitions: Appeals of Land Acquisition Decisions, 78 Fed. Reg. 67937 (Nov. 13, 2013). The regulation provides, "if the Secretary or Assistant Secretary approves [a trust] request, the Assistant Secretary shall … [i]mmediately acquire the land in trust under § 151.14 on or after the date such decision is issued and upon fulfillment of the requirements of § 151.13 and any other Departmental requirements." 25 C.F.R. § 151.12(c).

23.     Although the final rule claims as its purpose addressing the Supreme Court's decision in *Patchak*, its effect is to prevent aggrieved parties from seeking injunctive relief and to make challenging trust decisions far more difficult.

24.     On July 15, 2013, Stand Up filed comments opposing 25 C.F.R. § 151.12(c) for a variety of reasons, including that the regulation is designed to and will undermine judicial review under the APA. Other commenters specifically objected to the effect of the rule on 5 U.S.C. § 705.  *See* 78 Fed. Reg. 67928 at 67933 (Nov. 13, 2013). Stand Up did not challenge the regulation after it went into effect because the regulation did not threaten an immediate concrete injury to Stand Up's interests sufficient to establish standing under Article III. Its imminent application in this case, however, will cause Stand Up and the individual Plaintiffs irreparable harm.

**B.     Background on Trust Application for Wilton Rancheria**

25.     The Wilton Rancheria was established in 1928. In November 1927, Superintendent Lafayette A. Dorrington of the Sacramento Indian Agency reported that approximately 33 families of 150 homeless Indians resided in the vicinity of Sacramento,

California. Dorrington identified land located south-east of Sacramento, California and on June 14, 1928, the Commissioner of Indian Affairs approved purchase of approximately 37.88 acres of land "for use by the landless California Indians."

26.     In 1935, the Indians living on the Rancheria voted to organize under Section 16 of the IRA, and the Assistant Commissioner of Indian Affairs approved their governing documents in 1936.

27.     On October 13, 1955, the residents of the Wilton Rancheria voted to "have the United States transfer to them the fee title to their individual shares of this tract [Wilton Rancheria]."

28.     In 1958, Congress terminated the Wilton Rancheria pursuant to the California Rancheria Termination Act, Public Law 85-671 (Aug. 18, 1958). The assets of the Rancheria were distributed to the Indians then living on the Rancheria pursuant to a distribution plan approved by the Commissioner of Indian Affairs on July 6, 1959. On September 22, 1964, the Secretary published notice of termination of federal supervision over the Indians living on the Rancheria. 29 Fed. Reg. 13146 (Sept. 22, 1964).

29.     A group claiming to be the Wilton Miwok Rancheria Interim Tribal Council began contacting gaming investors at least as early as 2006 to develop a casino project, first by seeking "tribal restoration" and then seeking land to be acquired in trust.

30.     On May 21, 2007, the Wilton Miwok Rancheria Interim Tribal Council sued the United States as the "Wilton Miwok Rancheria" to be restored to federal recognition. Compl., *Wilton Miwok Rancheria v. Kempthorne*, No. 5:07-cv-02681-JF (N.D. Cal. May 21, 2007), ECF No. 1. The United States settled with the group on June 4, 2009, by stipulating that their termination was not lawfully executed and restoring them to status as a federally recognized tribe, without considering whether they qualified as such under the federal acknowledgment regulations. Judgment, *Wilton Miwok Rancheria v. Kempthorne*, No. 5:07-cv-02681-JF (N.D. Cal. July 16, 2009), ECF No. 62.

31.     The history of the Rancheria shows that it began as a collection of individual homeless Indians and their families that came together when the Rancheria site was purchased by the federal government in 1927 for the purpose of providing land for indigent Indians in the vicinity of Sacramento, California. Only one original resident is identified in the historical record as Miwok.  The other original residents of the Rancheria are from other tribes, including Concow, Yuki, "Digger" (a generic and usually negative term for Native Americans in California), and the San Juan Pueblo of New Mexico. Tribal affiliations were unknown to both residents and BIA for some residents.

32.     In addition, although the residents of the Rancheria organized in 1935 under the IRA, self-governance activities continued only until 1940. From 1940 to 1952, there is no record of any self-governance activities, and in 1952, residents organized to accept termination of federal guardianship.

33.     Nonetheless, the United States added the Rancheria to the list of tribes eligible for federal services in 2009.  74 Fed. Reg. 33468 (July 13, 2009).

34.     On July 24, 2012, the Wilton Rancheria and Boyd Gaming entered into a development agreement. Based on information and belief, the Wilton Rancheria identified a 282-acre site in the City of Galt as a potential casino site sometime in 2013 and thereafter filed an application to have the land acquired in trust with BIA.

35.     On December 4, 2013, BIA issued a Notice of Intent to Prepare an Environmental Impact Statement ("EIS") for a proposed trust acquisition and casino project under the National Environmental Policy Act ("NEPA"). 78 Fed. Reg. 72928-01 (Dec. 4, 2013).  The Rancheria applied to have "approximately 282 acres of fee land ... located within the City of Galt Sphere of Influence Area" acquired "in trust in Sacramento County, California, for the construction and operation of a gaming facility." *Id.* at 72928.

36.     BIA offered a 30-day public comment period, which ran from December 6, 2013, to January 6, 2014. *Id.* On December 19, 2013, BIA held a scoping meeting in Galt to seek public comment on the application for purposes of identifying issues to consider in the NEPA

analysis. *Id.* No one from the City of Elk Grove attended the scoping meeting, including the City of Elk Grove. Nor did anyone from Elk Grove provide comments in response to the scoping notice.

37.     On January 6, 2014, Stand Up filed comments in response to the scoping notice, including to request that the Regional Director "recuse herself and take action to ensure that someone that is not subject to her supervision or oversight take responsibility for overseeing the Wilton Project." The basis for Stand Up's recommendation was that, because the Regional Director has family members in the Wilton Rancheria, those relationships would create a conflict of interest in her review of the application.

38.     BIA issued an EIS Scoping Report in February 2014, which identified the Galt site as the proposed trust land and casino development.

39.     The EIS Scoping Report identified an approximately 28-acre site in Elk Grove as an alternative (a portion of the ultimate Casino Site), but BIA did not invite Elk Grove to participate as a cooperating agency or provide notice to the public that the Casino Site was a proposed trust site.

40.     BIA issued a Notice of Availability for the draft EIS on the proposed Galt acquisition on December 29, 2015. 80 Fed. Reg. 81,352 (Dec. 29, 2015). The draft EIS Notice identified the Galt site as the proposed trust property.

41.     In May 2016, the Wilton Rancheria entered into an option agreement for the sale of the Casino Site, the approximately 36-acre parcel of land in Elk Grove that is part of a larger approved development project unrelated to gaming.

42.     On June 9, 2016, the Wilton Rancheria announced that it would prefer to have the Casino Site acquired in trust for its casino. BIA did not publish a notice of a change in application, nor seek additional public comment in response to the change.

43.     On September 27, 2016, Plaintiffs Stand Up, Joe Teixeira, and Lynn Wheat submitted comments to BIA urging it not to proceed to a decision to acquire the Casino Site in trust on the basis of the draft EIS prepared for another parcel (i.e., the 282-acre site in Galt). The

Plaintiffs objected that the Casino Site constituted a new project under NEPA, requiring the preparation of a supplemental EIS pursuant to 40 C.F.R. § 1502.9 (requiring agencies to prepare a supplemental EIS when there are substantial changes to the proposed action or there are significant new circumstances).

44.     BIA did not prepare a supplemental EIS.

**C.     Encumbrances on the Elk Grove Casino Site and the State Law Proceedings**

45.     In 2001, the City of Elk Grove approved the Lent Ranch Special Planning Area, an approximately 295-acre area that includes the Elk Grove Casino Site by ordinance (Ord. 13-2001 P), as required under the laws of the State of California. The City prepared an environmental impact report ("EIR") under CEQA prior to approving the Lent Ranch Special Planning Area.

46.     Elk Grove subsequently executed a Development Agreement with the developers of the property, which included mandatory mitigation measures identified in the EIR. The terms of that Development Agreement were recorded on the deed to the land, pursuant to State law.

47.     In 2007, the City of Elk Grove approved by ordinance a development plan for an open-air mall on 107 acres of the Lent Ranch Special Planning Area, called the Elk Grove Promenade. As a part of that approval, the City imposed certain mall fees and infrastructure, the requirements for which were also recorded on the deed to the land, again pursuant to State law. In 2008, however, the developer of Elk Grove Promenade filed for bankruptcy, and another developer acquired rights to the development.

48.     In 2014, Elk Grove Town Center LP requested an amendment to the Special Planning Area to the Elk Grove Promenade. After determining that CEQA did not require another EIR, the City enacted Ordinance 29-2014, approving and authorizing the City of Elk Grove to enter into a 2014 Development Agreement. Ordinance 29-2014 bifurcated the Regional Mall Site into two areas: (1) Phase 1, which was to become a mall, covers the southern portion of the Elk Grove Promenade; and (2) Phase 2, which was not evaluated for any particular use,

covers the northern portion of the Elk Grove Promenade and includes the Elk Grove Casino Property.

49.     Section 4.5 of the 2014 Development Agreement reserved to the City of Elk Grove the right to: grant or deny land use approvals; approve, disapprove or revise maps; adopt, increase, and impose regular taxes, utility charges, and permit processing fees applicable on a city-wide basis; adopt and apply regulations necessary to protect public health and safety; adopt increased or decreased fees, charges, assessments, or special taxes; adopt and apply regulations relating to the temporary use of land, control of traffic, regulation of sewers, water, and similar subjects and abatement of public nuisances; adopt and apply Elk Grove engineering design standards and construction specifications; adopt and apply certain building standards code; adopt laws not in conflict with the terms and conditions for development established in prior approvals; and exercise Elk Grove's power of eminent domain with respect to any part of the property.

50.     A September 15, 2016 staff report prepared for the City of Elk Grove states that BIA identified the development agreements as encumbrances on the Elk Grove Casino Property and stated that the encumbrances must be removed before BIA can acquire the land in trust.

51.     Encumbrances, such as those created by the 2014 Development Agreement and recorded on the deed to the land, have historically prevented the Secretary from acquiring the land in trust for a tribe under a variety of authorities. Under BIA's regulations, the Secretary has historically required the elimination of any "liens, encumbrances, or infirmities" before acquiring land in trust. *See* 25 C.F.R. § 151.13(b). Encumbrances also prevent tribes from exercising sufficient "governmental authority" over land for it to qualify as "Indian Lands" eligible for gaming under the Indian Gaming Regulatory Act ("IGRA"). 25 U.S.C. § 2703(4)(B).

52.     On October 26, 2016, Elk Grove approved an amendment to the 2014 Development Agreement ("2016 Amendment") via Ordinance No. 23-2016, the purpose of which was to eliminate the encumbrances from the Casino Site.

53.     Under California law, an ordinance adopting or modifying a development agreement is a legislative act subject to referendum. California law imposes a waiting period of

30 days before an ordinance can be formally adopted to allow its citizens the right to subject the legislation to referendum. *See* Cal. Elections Code §§ 9235, 9237 ("If a petition protesting the adoption of an ordinance . . . is submitted to the elections official of the legislative body of the city in his or her office during normal office hours, as posted, within 30 days of the date the adopted ordinance is attested by the city clerk or secretary to the legislative body, and is signed by not less than 10 percent of the voters of the city . . . the effective date of the ordinance shall be suspended and the legislative body shall reconsider the ordinance.").

54.     On November 21, 2016, approximately 14,800 citizens, including Plaintiffs Patty Johnson, Joe Teixeira, and Lynn Wheat, of Elk Grove exercised their rights under the California Constitution by signing a petition to referend Ordinance No. 23-2016, which was timely filed with the City on November 30, 2016.

55.     Despite the mandatory waiting period set forth in Cal. Elections Code §§ 9235, 9237, Elk Grove executed and recorded the 2016 Amendment to the 2014 Development Agreement on the deed to the Casino Site on November 9, 2016, 16 days before State law allows. By recording the 2016 Amendment to the 2014 Development Agreement prematurely, the deed to the Casino Site no longer appeared to be encumbered.

56.     On November 23, 2016, Stand Up, Patty Johnson, and Joe Teixeira sued the City of Elk Grove in California state court, alleging that the City's failure to prepare an Environmental Impact Report evaluating the effects of the 2016 Development Agreement before approving Ordinance No. 23-2016 violated CEQA and that the City's premature recording of the 2016 Amendment violated state laws protecting the right of citizens to referend city ordinances. *See Stand Up California!, et al. v. City of Elk Grove, et al.*, No. 32-2016-80002493 (Cal. Super. Ct. Nov. 23, 2016) ("State Court Suit").

57.     On December 15, 2016, the City of Elk Grove recorded an acknowledgment that the Casino Site is still encumbered by the 2014 Development Agreement. In pertinent part, this acknowledgment states that "pending the disposition of the referendum petition, the effectiveness of the Ordinance and the Development Agreement Amendment is suspended."

58.     The City of Elk Grove verified the petition on January 6, 2017. The referendum cannot be held until April 11, 2017, at the earliest.

**D.     The Imminent and Irreparable Threat Post by BIA's Continued Processing of the Rancheria's Trust Application**

59.     Despite the mandatory State law deadlines, BIA issued a Notice of (Gaming) Land Application on November 17, 2016 for the Casino Property. The Notice provides a 30-day period for comment from interested parties. BIA extended that comment period on December 9, 2016, in response to a request from Stand Up based on BIA's failure to include information regarding the title to the Casino Property.

60.     On December 14, 2016, BIA issued a notice of the final EIS. *See* 81 Fed. Reg. 90379-01 (Dec. 14, 2016). That Notice was the first public notice BIA provided of the Wilton Rancheria's project change from the site in Galt to the Casino Property.

61.     BIA did not respond to the comments Plaintiffs Stand Up, Joe Teixeira, and Lynn Wheat filed on September 27, 2016 in the final EIS.

62.     Two days later, on December 16, 2016, EPA issued a Notice of Availability of the final EIS in the Federal Register. *See* 81 Fed. Reg. 91169 (Dec. 16, 2016). Consistent with NEPA regulations, 40 C.F.R. § 1506.1, and as set forth in BIA's Notice, "[t]he BIA will issue a Record of Decision (ROD) on the proposed action no sooner than 30 days after the date EPA publishes its Notice of Availability in the Federal Register." 81 Fed. Reg. 90379-01 (Dec. 14, 2016). Accordingly, BIA can make a final decision as soon as January 16, 2017.

63.     Plaintiffs anticipate challenging the Secretary's decision to acquire land in trust for the Wilton Rancheria under the IRA, IGRA, NEPA, and the APA. Until the Secretary issues a final decision, however, Plaintiffs cannot determine which claims it will assert.

64.     Because 25 C.F.R. § 151.12(c) requires the Assistant Secretary to "[i]mmediately acquire the land in trust under § 151.14 on or after the date such decision is issued," however, Plaintiffs cannot wait until January 16, 2017 to seek relief under 5 U.S.C. § 705. Absent emergency relief from this Court, Defendants' immediate transfer of the title to land into trust

will result in irreparable harm to Plaintiffs by eliminating their CEQA claims and their right to referendum the City's ordinance.

65.     On January 6, 2017, counsel for Plaintiffs contacted Solicitor Hilary Tompkins and Assistant Secretary Larry Roberts to seek Defendants' written assurance by January 9, 2017, that if Defendants decide to issue an affirmative decision to take land into trust for the Wilton Rancheria, they would not effectuate the transfer of title to that land before Plaintiffs have an opportunity to seek emergency judicial relief.

66.     On January 9, 2017, Eric Shepard, the Associate Solicitor, Indian Affairs, responded by email regarding Plaintiffs' counsel's request to Mr. Roberts and Ms. Tompkins of January 6, 2017, stating that "[t]he Department has not yet made a decision whether to acquire the Elk Grove Mall Site in trust and therefore your request is premature." Mr. Shepard also cited 25 C.F.R. § 151.12(c)(2)(iii) as requiring Defendants to acquire title to land in trust immediately upon issuing a decision. With respect to Plaintiffs' concerns regarding harm, Mr. Shepard responded that "if a court determines that the Department erred in making a land-into-trust decision, the Department has stated that it will comply with a final court order and any judicial remedy that is imposed."

67.     The BIA repeatedly changed its position regarding the ease with which land can be removed from trust.  BIA has previously represented to federal courts (in cases not involving the pending state law as here) that the transfer of land into trust is not irreparable harm.  *See* Opp'n to Pl.'s Req. for a TRO at 6-7*, Cachil Dehe Band of Wintun Indians of the Colusa Indian Community v. Salazar*, No. 2:12-cv-03021-JAM-AC (E.D. Cal. Jan. 18, 2010), ECF No. 24. More recently, however, the United States represented to the federal district court in Massachusetts that removal of the land from trust is time-consuming and difficult, that removal raises thorny jurisdictional issues, and that there is no clear process for removing land.  Aff. of Bruce W. Maytubby in Opp'n to Pls.' Mot. for Prelim. Inj. of Writ, *Littlefield v. U.S. Dep't. of Interior*, No. 1:16-cv-10184-WGY (D. Mass. June 17, 2016), ECF No. 38-1.

## FIRST CAUSE OF ACTION

### Violation of the APA

68.     Each of the foregoing allegations is incorporated herein by reference.

69.     Section 705 of the APA states that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process *to postpone the effective date of an agency action or to preserve status or rights pending* conclusion of the review proceedings." 5 U.S.C. § 705 (emphasis added).  Congress clearly authorized federal courts to prevent irreparable injury from agency action before that injury occurs.

70.     BIA's regulation at 25 C.F.R. § 151.12(c) requires the Assistant Secretary to transfer title to the proposed trust land to the United States *before* Plaintiffs can seek a stay or other relief, thereby having the effect of negating Plaintiffs' right to seek and federal courts to grant relief under 5 U.S.C. § 705.

71.     Section 705 of the APA also provides that "[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review."

72.     BIA, however, has stated to Plaintiffs that it is required to comply with 25 C.F.R. § 151.12(c), and cannot postpone the effective date of its decisions.

73.     BIA's interpretation of 25 C.F.R. § 151.12(c) violates 5 U.S.C. § 705.

74.     BIA acted arbitrarily and capriciously in promulgating 25 C.F.R. § 151.12(c) without having any clear process for removing land from trust, if ordered by a federal court to do so.

75.     Under the APA, "agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" shall be held "unlawful and set aside." *Id.* § 706(2)(A).  BIA's regulation 25 C.F.R. § 151.12(c) directly conflicts with 5 U.S.C. § 705 and is not in accordance with law.

## SECOND CLAIM FOR RELIEF

### Ultra Vires Action

76.     Each of the foregoing allegations is incorporated herein by reference.

77.     BIA's regulation 25 C.F.R. § 151.12(c) is intended to undermine or eliminate the right of aggrieved parties to seek preliminary injunctive relief and the ability of federal courts to consider such applications. The regulation ultimately undermines judicial review of agency action and/or prevents courts from being able to afford complete relief.

78.     The regulation is ultra vires and constitutes an unconstitutional assumption of legislative authority by the Secretary in violation of the doctrine of separation of powers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment as follows:

a.  Declaring that 25 C.F.R. § 151.12(c) violates the Administrative Procedure Act, 5 U.S.C. § 705;

b.  Declaring that the Secretary, in promulgating 25 C.F.R. § 151.12(c), exceeded her authority under the APA and unlawfully exercised legislative authority reserved for Congress in violation of the doctrine of separation of powers;

c.  Vacating and setting aside 25 C.F.R. § 151.12(c);

d.  Ordering the Secretary to comply with 5 U.S.C. § 705 by providing sufficient opportunity for parties aggrieved by a decision to acquire land in trust to seek relief prior to transferring title to land in trust to the United States;

e.  Pending the final determination of this matter on the merits, the Court grant all necessary temporary, preliminary, or interim relief to preserve the status quo, including a preliminary injunction barring the BIA from taking the land into trust pending resolution of this suit; and

f.  Grant Plaintiffs any and all other, further, and additional relief as the Court may deem just and proper, including all necessary and appropriate declarations of rights and injunctive relief.

Dated this 11th day of January, 2017      Respectfully submitted,

**PERKINS COIE LLP**

By: _____

    Jennifer A. MacLean, Bar No. 1013448
    JMacLean@perkinscoie.com
    700 Thirteenth Street, N.W., Suite 600
    Washington, D.C. 20005-3960
    Telephone: 202.654.6200
    Facsimile: 202.654.6211

    *Attorneys for Plaintiffs*
    *Stand Up for California!*
    *Patty Johnson*
    *Joe Teixeira*
    *Lynn Wheat*