**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **STAND UP FOR CALIFORNIA! et al.,** |
| Plaintiffs, |
| v. |
| **U.S. DEPARTMENT OF INTERIOR et al.,** |
| Defendants, |
| and |
| **WILTON RANCHERIA, CALIFORNIA** |
| Intervenor-Defendant. |

Case No. 1:17-cv-00058 (TNM)

## MEMORANDUM OPINION

The U.S. Department of the Interior and its Bureau of Indian Affairs (collectively, "Federal Defendants" or the "Department") agreed to acquire land in trust for the Wilton Rancheria Tribe of California ("Wilton") to build a casino in Elk Grove, California. Several Elk Grove residents and an advocacy organization, Stand Up for California! (collectively, "Stand Up"), challenge that acquisition.

In a previous ruling, the Court granted summary judgment to the Department and Intervenor-Defendant Wilton Rancheria (collectively, the "Defendants") on Counts I and II, which challenged the authority of interim decision-makers to act on Wilton Rancheria's trust application. *See Stand Up for Cal! v. U.S. Dep't of Interior*, 298 F. Supp. 3d 136 (D.D.C. 2018) ("*Stand Up I*"). Pending here are Stand Up's motion for summary judgment and cross-motions for summary judgment from the Department and Wilton on the remaining counts. Finding that

the Department complied with the relevant statutes when it acquired the Elk Grove site, the

Court will grant summary judgment for the Department and Wilton and deny it for the Plaintiffs.

## I.       BACKGROUND

In 2013, Wilton asked the Bureau of Indian Affairs ("BIA") to acquire land in trust on its

behalf, identifying a 282-acre parcel near Galt, California as the proposed site.  AR13431; Mem.

in Opp. to Pls.' Mot. for Summ. J. and in Supp. of Wilton Rancheria, Cal.'s Cross-Mot. for

Summ. J. ("Wilton's Cross-Mot. for Summ. J.") 18, ECF No. 96; *see* Am. Compl. ¶ 31, ECF No.

26.[1]  The BIA examined the Galt site for three years, along with six alternatives.  AR16281;

Mem. in Opp. to Pls.' Mot. for Summ. J. and in Supp. of Fed. Defs.' Cross-Mot. for Summ. J.

("Fed. Defs.' Cross-Mot. for Summ. J.") 12, ECF No. 98–1.  The BIA published a notice of the

Final Environmental Impact Statement ("Final EIS") shortly after the November 2016

presidential election, not for the Galt site (Alternative A), but for a different, 36-acre parcel of

land in nearby Elk Grove (Alternative F).  AR10259; *see also* FEIS and a Revised Draft

Conformity Determination for the Proposed Wilton Rancheria Fee-to-Trust and Casino Project,

Sacramento County, Cal., 81 Fed. Reg. 90379 (Dec 14, 2016).

Stand Up had expected during the years-long process that the Department would acquire

land in Galt, not Elk Grove, so they immediately sought to delay the acquisition of title to the Elk

Grove land by making several requests to the Secretary of the Interior (the "Secretary").  Am.

Compl. ¶¶ 38, 40.  When the Department denied Stand Up's requests, they sued in this District,

seeking a temporary restraining order and preliminary injunction against the Department to

prevent acquisition of title to the land.  *Id.* ¶ 41.  Another judge in this District denied the

---

[1] All page citations are to the page numbers generated by the Court's CM/ECF system.

motions, after which Stand Up formally applied to the Department for a stay under 5 U.S.C. § 705.  Minute Order, Jan. 13, 2017; Minute Order, Jan. 17, 2017; Am. Compl. ¶ 43.

Rather than halting the process, the Department shifted into warp speed—for a federal bureaucracy—to approve the application for the Elk Grove site.  The Environmental Protection Agency ("EPA") filed a Federal Register notice of the Final EIS, which created a 30-day waiting period that expired January 17, 2019.  Environmental Impact Statements; Notice of Availability, 81 Fed. Reg. 91169 (Dec. 16, 2016); Fed. Defs.' Cross-Mot. for Summ. J. 13.  Two days after the waiting period expired the Department issued a Record of Decision ("ROD") approving Wilton's application and authorizing acquisition of the Elk Grove land in trust.  AR24430; Fed. Defs.' Cross-Mot. for Summ. J. 13.  This was the final day of the Obama Administration.

After the Court's decision in *Stand Up I*, Counts III–V remain.  *See* 298 F. Supp. 3d at 138.  Count III challenges Wilton Rancheria's status as a "recognized Indian tribe now under Federal jurisdiction."  Am. Compl. ¶ 87; 25 U.S.C. § 5129.  Count IV alleges that the Elk Grove Site cannot be used for gaming because it does not qualify as "Indian lands."  Am. Compl. ¶¶ 94, 96, 101; 25 U.S.C. § 2703(d).  Count V challenges the Department's compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (D).  Am. Compl. ¶¶ 103–104.  The parties' cross-motions for summary judgment are now ripe.  Pls.' Mot. for Summ. J., ECF No. 91; Wilton's Cross-Mot. for Summ. J., ECF No. 96; Fed. Defs.' Cross-Mot. for Summ. J., ECF No. 98-1.[2]

---

[2] This Court's jurisdiction and venue are established under 28 U.S.C. §§ 1331, 1391, 2201–2202 and 5 U.S.C. §§ 702, 706.

## II.     LEGAL STANDARD

Summary judgment is usually only appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. Pro. 56.  But when a court is reviewing an administrative agency's decision, the standard set out in Federal Civil Procedure Rule 56 does not apply.  *See Richards v. I.N.S.*, 554 F.2d 1173, 1177 (D.C. Cir. 1977).  Instead, as the parties acknowledge, courts review an agency's decision under the APA.  *See Ramaprakash v. Fed. Aviation Admin.*, 346 F.3d 1121, 1124 (D.C. Cir. 2003).

When a party challenges agency action under the APA, "the district judge sits as an appellate tribunal" and the "entire case on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001) (cleaned up).  A court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 705; *Mayo v. Reynolds*, 875 F.3d 11, 19 (D.C. Cir. 2017).  "Agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency.'"  *Mayo*, 875 F.3d at 19 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  A court "must not substitute its own judgment for that of the agency."  *Id.* at 19–20 (cleaned up).

## III.     ANALYSIS

### A.  The Plaintiffs Have Standing to Sue

The Court begins by considering Article III standing.  At least one plaintiff "must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling."  *Dep't of*

*Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) (internal quotations omitted). Stand Up

has standing "if one of its members has standing." *Safari Club Int'l v. Jewell*, 842 F.3d 1280,

1285 (D.C. Cir. 2016).

Plaintiffs Joe Teixeira, Patty Johnson, and Lynn Wheat are all residents of Elk Grove,

who claim harm "by the decision to acquire land in trust and the environmental impacts of the

proposed action." Am. Compl. ¶ 8. Stand Up for California! itself, meanwhile, includes Elk

Grove residents who "will be affected by the environmental and economic impacts of the

Rancheria's proposed trust acquisition and tribal casino." *Id.* ¶ 9. They seek declaratory and

injunctive relief in the form of a court order "directing Defendants to invalidate the [Record of

Decision] and record a rescission of the February 10, 2017 acceptance of the grant deed, in order

to remove the Elk Grove Site from trust." *Id.* ¶¶ 1, 7. Thus, they meet all three standing

requirements. The Defendants do not argue otherwise.[3]

## B. Count III: Wilton is a Federally Recognized Tribe

After granting summary judgment to the Defendants on Counts I and II in *Stand Up I*,

298 F. Supp. 3d at 138, the Court now addresses Count III, which challenges Wilton Rancheria's

legal status as a federally recognized Indian tribe. Am. Compl. ¶ 87. To analyze this claim, one

must retrace Wilton's history.

The historic Wilton Rancheria was in Sacramento County, on land acquired for it by the

federal government. Am. Compl. ¶ 26. Then, in 1958, roughly 30 years after the government

acquired the Rancheria, Congress enacted the California Rancheria Act ("CRA"), which

authorized the termination of Wilton Rancheria and 40 other California tribes. Pub. L. No. 85-

671, 72 Stat. 619 (amended 1964). The CRA stated that, "After the assets of a rancheria or

---

[3] *But see* Fed. Defs.' Mot. for Summ. J. 43. Part C.2 of this Opinion addresses Stand Up's standing to challenge the
Department's title examination review.

reservation have been distributed pursuant to this Act, the Indians who receive any part of such assets, and the dependent members of their immediate families shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians." CRA § 10(b), 72 Stat. at 621.

But that was not the end of the rancheria saga. Congress later "expressly repudiated the policy of terminating recognized Indian tribes" by enacting the Federally Recognized Indian Tribe List Act of 1994 ("List Act"), Pub. L. No. 103-454, § 103, 108 Stat. 4791. The List Act expressed Congressional intent "to restore recognition to tribes that previously have been terminated." *Id.* It directed the Secretary of the Interior to keep "a list of all federally recognized tribes" in the United States. *Id.* And along with other authorizing laws, Congress delegated to the Secretary the authority to decide "whether groups have been federally recognized in the past or whether other circumstances support current recognition." *Mackinac Tribe v. Jewell*, 829 F.3d 754, 757 (D.C. Cir. 2016) (citing 25 U.S.C. § 2). The List Act also said that an Indian tribe may be recognized "by a decision of a United States court," which "may not be terminated except by an Act of Congress." List Act § 103, 108 Stat. at 4791.

Under that authority, ten years ago, the Department and the Wilton Rancheria entered into a stipulated judgment in the Northern District of California restoring Wilton Rancheria as a federally recognized tribe. *See* AR596–621; Stipulation and Order for Entry of Judgment, *Wilton Miwok Rancheria v. Salazar*, No. 5:07-cv-02681-JF (N.D. Cal. June 8, 2009), ECF No. 61. The Department issued a Federal Register notice relieving Wilton Rancheria from "the application of section 10(b) of the [CRA]" and entitling the tribe to "the same status as it possessed prior to distribution of the assets of the Rancheria." Restoration of Wilton Rancheria, 74 Fed. Reg. 33468-02 (July 13, 2009). The federal government's list of recognized tribes now

includes Wilton. *See* Indian Entities Recognized by and Eligible to Receive Services From the U.S. Bureau of Indian Affairs, 84 Fed. Reg. 1200-01, 1204 (Feb. 1, 2019).

In the Indian Reorganization Act ("IRA") of 1934, Congress delegated to the Department authorization to acquire land in trust "for the purpose of providing land for Indians." 25 U.S.C. § 5108. The term "Indian" under the IRA includes "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction." *Id.* § 5129. The Secretary has created procedures for these "fee-to-trust" actions in the Code of Federal Regulations. *See* 25 C.F.R. § 151.1 *et seq*.

Stand Up makes, in its words, a "straightforward" argument that the CRA precludes the Federal Defendants' trust acquisition. Pls.' Reply Mem. 9, ECF No. 100. In its final form, that argument goes like this: The CRA says that "all statutes of the United States which affect Indians because of their status as Indians" do not apply to Indians who received "the assets of a rancheria or reservation" under the Act. *Id.*; *see* CRA § 10(b), 72 Stat. at 621. Indians in Wilton received rancheria assets under the CRA. Pls.' Reply Mem. 9. The Department thus violated the CRA when it acquired land in trust for the Wilton Rancheria under Section 5 of the IRA. *Id.* at 9–10; *see* 25 U.S.C. § 5108. The stark language of the CRA buttresses Stand Up's argument.

But the Department and Wilton challenge Stand Up's second premise and argue that the stipulated judgment between the Department and Wilton restored the tribe to the same status it held before the rancheria assets were distributed under the CRA. Fed. Defs.' Reply Mem. 6, ECF No. 104; Wilton's Reply Mem. 8–9, ECF No. 103. Wilton notes that the CRA "only applies to a rancheria once its assets 'have been distributed *pursuant to this Act*.'" Wilton's Reply Mem. 8–9 (quoting CRA § 10(b)). And the judgment said expressly that Wilton "was not lawfully terminated, and the Rancheria's assets were not distributed, in accordance with the

provisions of the [CRA]." AR602. The judgment even addressed trust land, stipulating that "The Department of the Interior will process . . . any applications for land into trust for any parcels of land acquired by the Tribe." AR605. The Defendants have the better argument here. Under the plain terms of the stipulated judgment, the CRA does not apply to Wilton.

And that is not all. Congress authorized restoration for "tribes that previously have been terminated." List Act § 103, 108 Stat. at 4791. More, the List Act specifically prescribed "a decision of a United States court" as one of the methods for tribal recognition. *Id.* So even if the CRA did strip Wilton of its tribal status, the List Act and the stipulated judgment relieved Wilton from "the application of section 10(b) of the [CRA]" and entitled the tribe to "the same status as it possessed prior to distribution of the assets of the Rancheria." 74 Fed. Reg. 33468-02. To the extent that there is a conflict between the 1958 CRA and 1994 List Act, of course the more recent statute prevails. *See Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000).

In earlier filings, Stand Up appeared to challenge the 2009 settlement itself, arguing that the Department "cannot violate a federal statute because it agreed to the action by stipulation," and characterizing the settlement agreement as a violation of federal law. Pls.' Mot. for Summ. J. 20 & n.4. But their Reply Brief clarifies that they do not challenge the settlement itself, and they now assert that the settlement cannot restore rights that the CRA revoked. *See* Pls.' Reply Mem. 12 ("[T]he Plaintiffs did not challenge—and did not need to challenge—Wilton's status as a federally recognized tribe to assert that BIA lacks authority to acquire the Elk Grove Site in trust."). By going all in on the CRA argument, Stand Up has abandoned its attack on the settlement agreement.[4]

---

[4] Stand Up also takes pains to argue that the Department "conflates 'restoration' and 'recognition'" despite important differences between the two concepts. Pls.' Reply Mem. 12. But after highlighting those differences,

This is a difficult line for Stand Up to walk, however. After all, Congress specifically authorized the restoration of terminated tribes to their pre-CRA status. *See* List Act § 103, 108 Stat. at 4791. And the court judgment reset the CRA's effects, stipulating that Wilton "was not lawfully terminated, and the Rancheria's assets were not distributed, in accordance with the provisions of the [CRA]." AR602. If one accepts the stipulated judgment, one must also accept that it carried out Congressional intent to undo the purported termination of Wilton's status under the CRA. After conceding the settlement's legitimacy, Stand Up reveals its own argumentative flaw: even if the syllogism is valid, Stand Up's conclusion does not follow.

Stand Up is no new fish to the casino litigation scene. They recently brought a challenge to a similar stipulated judgment involving the North Fork Tribe. *See Stand Up for California! v. Dep't of Interior* ("*North Fork*"), 204 F. Supp. 3d 212 (D.D.C. 2016), *aff'd*, 879 F.3d 1177 (D.C. Cir. 2018). In dismissing Stand Up's challenge, Chief Judge Howell noted that North Fork's stipulated judgment reflected the coordinated judgment of all three branches of the federal government. *Id.* at 300–301. The executive and judiciary "validated the existence of the North Fork Tribe and found the Tribe to qualify appropriately as a recognized Indian tribe," *id.* at 300, and Congress sanctioned that judgment through the List Act. *See id.* at 300–301; List Act § 103(3). The result in *North Fork* was that the tribe "as a federally recognized Indian tribe, has the benefit of land acquisition under § 465 of the IRA, like any other federally recognized tribe." 204 F. Supp. 3d at 301. So too here. There is no basis to invalidate the Department's land acquisition for Wilton; it rests on the tripartite authority of the entire federal government. The Court will grant summary judgment to the Defendants as to Count III.

---

Stand Up concludes that the distinction would matter only if they had "actually challenged Wilton's 'restoration' or 'recognition.'" *Id.* at 13. "But because Plaintiffs do not challenge either, the Court need not decide whether [the Department's decision to recognize Wilton] warrants judicial deference." *Id.* at 13–14. The Court agrees. Like Stand Up's arguments against the settlement agreement itself, the Court considers these arguments abandoned.

### C.  Count IV:  The Department May Acquire Gaming Land for Wilton

#### 1.  Stand Up Lacks Standing to Assert its Encumbrances Claim

Count IV challenges the Department's authority to acquire land for Wilton under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701, *et seq.*  The IGRA "provide[s] a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."  *Id.* § 2702(1).

Stand Up argues that encumbrances on the Elk Grove site prevent it from qualifying as "Indian lands" under the IGRA, defined as "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power."  25 U.S.C. § 2703(4); *see* Pls.' Mot. for Summ. J. 45.  Stand Up claims that the Department violated the APA by failing to resolve the encumbrances.  Pls.' Mot. for Summ. J. 45.  But Stand Up lacks Article III standing to assert this because they do not have an interest in the Department's title examination process.  *See* AR14062–63; *New York*, 139 S. Ct. at 2565.

The Department's regulations do not require that all encumbrances be eliminated before acquiring land.  The key question is whether the Secretary "determines that the liens, encumbrances or infirmities make title to the land unmarketable."  25 C.F.R. § 151.13(b).  If title will be unmarketable, the Secretary "*shall* require elimination" of the encumbrances before "taking final action on the acquisition."  *Id.* (emphasis added).  But if the Secretary concludes title will remain marketable despite the liens, encumbrances, or infirmities, elimination is discretionary.  *Id.*

The Department noted in its ROD that the purpose of title evidence "is to ensure that the Tribe has marketable title to convey to the United States, thereby protecting the United States." AR14064 n.198; *see also* Title Evidence for Trust Land Acquisitions, 81 Fed. Reg. 30173-02, 30174 (May 16, 2016). The Department also found that title examination "is separate from the process of deciding whether to accept land in trust in the first place," and that "only the United States has an interest in ensuring its own compliance with the title examination process." AR14063–64.

Stand Up rests their challenge on the vindication of private property rights. Pls.' Mot. for Summ. J. 45 ("To the extent that proposed trust land might include private rights (e.g., easements, right-of-way, etc.), it is critical that those property rights be protected."). But not their own. *See* Fed. Defs.' Cross-Mot. for Summ. J. 43. Recall that standing requires "an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *New York*, 139 S. Ct. at 2565.

Stand Up lacks standing because they have not suffered an "injury in fact." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). As the Department correctly argues, "a plaintiffs' injury in trust challenges typically derives from the decision to accept land in trust, not from the title examination that precedes the formal conveyance of title." Fed. Defs.' Cross-Mot. for Summ. J. 43–44. *Accord Upstate Citizens for Equal., Inc. v. Jewell*, No. 5:08- CV-0633 LEK, 2015 WL 1399366, at *12 (N.D.N.Y. Mar. 26, 2015) ("Plaintiffs' alleged injuries are caused by the decision to acquire the land into trust, and not by the title examination procedures."), *aff'd sub nom.*, *Upstate Citizens for Equal., Inc. v. United States*, 841 F.3d 556 (2d Cir. 2016). Stand Up does not have an interest in either the land acquisition or the title

examination process, instead challenging the Department's review based on evidence that Wilton and the Department recognized encumbrances as obstacles to clean title. *See id.* at 45–46; AR213–15, AR1206, AR3386–87, AR3752. This is not a concrete and particularized injury. *See New York*, 139 S. Ct. at 2565.

The APA "grants standing to a person 'aggrieved by agency action within the meaning of a relevant statute.'" *Assoc. of Data Proc. Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970) (quoting 5 U.S.C. § 702). And it is well settled that plaintiffs like Stand Up can challenge land-into-trust acquisitions under the IGRA and the Department's regulations when they have an interest in the land. *See, e.g.*, *Amador County, Cal. v. Salazar*, 640 F.3d 373, 379 (D.C. Cir. 2011). But the Department's title examination is different because unlike a land acquisition, clean title affects only the United States, not the "surrounding community." *See id.* Under the Department's regulations, the Secretary must obtain title evidence, but retains discretion to resolve liens, encumbrances, or infirmities. 25 C.F.R. § 151.13. So while the Department's land acquisition itself might encroach on property rights or the public's land use, infirm title affects only the United States. Title Evidence for Trust Land Acquisitions, 81 Fed. Reg. at 30174. Recognizing this, the ROD rejected public participation precisely because title review ensures that "the title actually taken does not expose the United States to liability." AR14064.

Stand Up's claims against the Department's title review exceed the limits of the standing doctrine. "NEPA, of course, is a statute aimed at the protection of the environment." *ANR Pipeline Co. v. FERC*, 205 F.3d 403, 408 (D.C. Cir. 2000). And the APA confers a right of judicial review for those wronged by agency action, including those in violation of NEPA. *See* 5 U.S.C. § 702. But parties cannot challenge an agency's internal processes when they are of no direct consequence to the challenger. To extend standing as far would be hardly different than

conferring standing on the rejected basis of "informational injury," which the D.C. Circuit predicts "would potentially eliminate any standing requirement in NEPA cases." *Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 84 (D.C. Cir. 1991).

To illustrate this, consider whether Stand Up's theory would bar anyone from making similar arguments against the Department's title review. Although they rest their challenge on the assumption that the encumbrances reveal private property rights, Stand Up does not allege any interest in those rights at all. *See* Pls.' Mot. for Summ. J. 45. And if they do not have an interest in the property but can nevertheless claim standing to challenge the title examination, there is no limiting who could pursue the same challenge. *Cf. Lyng*, 943 F.2d at 85 ("If one of NEPA's purposes is to provide information to the public, any member of the public—anywhere—would seem to be entitled to receive it.").

Because Stand Up has not suffered an injury as a result of the Department's title review, they have no more right to challenge the title examination than any other member of the public. Their claim ignores the "irreducible constitutional minimum of standing" that a "plaintiff must have suffered or be imminently threatened with a concrete and particularized injury in fact. . . ." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (internal citations and quotations omitted). It therefore cannot stand.

## 2. Wilton Qualifies for the Indian Gaming Regulatory Act's "Restored Lands" Exception

Although the IGRA generally prohibits gaming on newly acquired land, there is an exception "when lands are taken into trust as part of the restoration of lands for an Indian tribe that is restored to Federal recognition." *Id.* § 2719(b)(1)(B)(iii). The Department's

implementing regulations for the IGRA are codified in 25 C.F.R. Part 292 (2008). Under the

"restored lands" exception, Wilton must meet each of these four conditions:

> (a) The tribe at one time was federally recognized;
>
> (b) The tribe at some later time lost its government-to-government relationship;
>
> (c) At a time after the tribe lost its government-to-government relationship, the tribe was
>      restored to Federal recognition; and
>
> (d) The newly acquired lands meet the criteria of "restored lands."

25 C.F.R. § 292.7. Each of the four conditions also references a later section in the regulation,

which the Court analyzes below. *See id.*

Wilton applied to the Department for a determination that it qualifies under this "restored

lands" exception. AR14035. Stand Up argues that Wilton cannot qualify as a restored tribe and

the Elk Grove site cannot qualify as restored land. Am. Compl. ¶¶ 98, 100.

The Department's Record of Decision ("ROD") contained a full analysis of Wilton's

qualification under the "restored lands" exception. *See* AR14034–45. When reviewing agency

interpretation of a statute, the Court "must give effect to the unambiguously expressed intent of

Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). In

keeping with *Kisor v. Wilkie*, the Court reviews the Department's application of its own

regulation in the same way, "exhaust[ing] all the 'traditional tools' of construction" to determine

the meaning of the regulation. 139 S. Ct. 2400, 2415 (2019) (citing *Chevron*, 467 U.S. at 843

n.9).

The Court finds both the IGRA and the Department's regulation unambiguous and agrees

with the Department that Wilton qualifies under the "restored lands" exception. *See* AR14034–

14045. Wilton meets the first condition because it was at one time federally recognized under at

least three of the five methods for determining tribal recognition listed in 25 C.F.R. § 292.8. *See*

AR14037. Congress terminated the Wilton Rancheria in the CRA, proving the existence of a

14

government-to-government relationship between Congress and Wilton before the termination. *See* AR14036–37; 25 C.F.R. § 292.8(c); CRA § 10(b), 72 Stat. at 621. The same termination also satisfies the second requirement that Wilton later lost its government-to-government relationship. *See* AR14038; 25 C.F.R. § 292.9(a). Third, a "court-approved settlement agreement entered into by the United States" restored Wilton to federal recognition. 25 C.F.R. § 292.10(c); *see* AR14038–39, AR596–621. Because Wilton meets the first three conditions in § 292.7, the Court agrees with the Department that Wilton "is a 'restored tribe' for purposes of IGRA and Part 292." AR14039.

To meet the fourth requirement, the newly acquired land must qualify as "restored lands" under § 292.11. 25 C.F.R. § 292.7(d). Additionally, because a court-approved settlement restored Wilton, § 292.11(c) applies, and in turn points to the requirements of § 292.12:

(a) The newly acquired lands must be located within the State or States where the tribe is now located, as evidenced by the tribe's governmental presence and tribal population, and the tribe must demonstrate one or more of the following modern connections to the land:

    (1) The land is within reasonable commuting distance of the tribe's existing reservation;

    (2) If the tribe has no reservation, the land is near where a significant number of tribal members reside;

    (3) The land is within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust; or

    (4) Other factors demonstrate the tribe's current connection to the land.

(b) The tribe must demonstrate a significant historical connection to the land.

(c) The tribe must demonstrate a temporal connection between the date of the acquisition of the land and the date of the tribe's restoration. To demonstrate this connection, the tribe must be able to show that either:

    (1) The land is included in the tribe's first request for newly acquired lands since the tribe was restored to Federal recognition; or

(2) The tribe submitted an application to take the land into trust within 25 years after the tribe was restored to Federal recognition and the tribe is not gaming on other lands.

Wilton meets the requirements under § 292.12(a)(3) and (4).  As the Department noted in its ROD, the Elk Grove site is two miles from Wilton's current headquarters and three miles from its former headquarters, satisfying subsection (a)(3).  AR14042.  And the site is within Wilton's Service Delivery Area of Sacramento County, satisfying subsection (a)(4).  *Id.*; Indian Health Service, Notice of Service Delivery Area Designation for Wilton Rancheria, 78 Fed. Reg. 55731-02 (Sept. 11, 2013).

Wilton also has "significant historical connection" to the site, which "means the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty, or a tribe can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land."  25 C.F.R. § 292.2.  The Department found that the site "is located within the territory once predominantly occupied by" ancestors of Wilton members, near "historic" village sites of other ancestors, "and just a short distance from territory predominantly occupied by" still other ancestors.  AR14042–43.  The site is also fewer than six miles from the historic Wilton Rancheria and "a short distance" from a cemetery that Wilton "members have long used as a burial site."  AR14043.  These attachments show Wilton's historical connection to the Elk Grove site.

Finally, Wilton has met the "temporal connection between the date of the acquisition of the land and the date of the tribe's restoration."  25 C.F.R. § 292.12(c).  Despite Stand Up's argument to the contrary—which they raise only in a footnote, *see* Pls.' Mot. for Summ. J. 21 n.6—Wilton included the land in "the tribe's first request for newly acquired lands" since restoration.  25 C.F.R. § 292.12(c)(1).  While Wilton first requested acquisition of the Galt site, they withdrew that request in favor of the Elk Grove land.  AR13215.  The Galt site was not a

separate parcel under the "restored lands" exception as Stand Up claims, because the Department never acquired it. *See* 25 C.F.R. § 292.2 ("Newly acquired lands means land that has been taken, or will be taken, in trust . . . ."). In other words, since the Department never approved Wilton's request for the Galt land, the Department never considered it "newly acquired lands." *See* 25 C.F.R. § 292.12(c)(1).

Wilton also independently satisfied the temporal requirement under subsection (c)(2), by making its trust application well within 25 years of tribal restoration. Wilton applied only five years after the 2009 restoration settlement. AR596–621, AR14045. Even if Wilton had not met the "first request" requirement of subsection (c)(1), this alone would meet the temporal requirement. Thus, the Court agrees with the Department that the Elk Grove site qualifies as "restored lands" and that Wilton meets all four requirements of the IGRA's "restored lands" exception. *See* AR14045; 25 U.S.C. § 2719(b)(1)(B)(iii). The Court will grant summary judgment to the Defendants as to Count IV.

### D. Count V: The Department Complied with NEPA and the APA

Count V challenges the Department's compliance with NEPA and the APA. Am. Compl. ¶¶ 103–104; *see* 42 U.S.C. §§ 4321 *et seq.*; 5 U.S.C. § 706(2)(A), (D). Before any federal agency adopts a major action "significantly affecting the quality of the human environment," NEPA requires "a detailed statement" on "the environmental impact of the proposed action," as well as any potential "alternatives to the proposed action." 42 U.S.C. § 4332(c). This process ensures that agencies "consider every significant aspect of the environmental impact of a proposed action" and keep the public informed about their analysis. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). "In other words, agencies must 'take a hard look at [the] environmental consequences' of their actions, and 'provide for broad dissemination

of relevant environmental information.'" *Pub. Emps. for Envtl. Responsibility v. Hopper*, 827 F.3d 1077, 1082 (D.C. Cir. 2016) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)) (brackets in original).

The purpose of this requirement is to ensure "'a fully informed and well-considered decision, not necessarily' the best decision." *Theodore Roosevelt Conserv. P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010) (quoting *Vt. Yankee Nucl. Pow. Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)). "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

Court review of administrative actions under NEPA is the same as APA review. *Mayo*, 875 F.3d at 19. The Supreme Court has stated that "inherent in NEPA and its implementing regulations is a 'rule of reason.'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004). The rule of reason governs judicial review of decisions not to supplement an Environmental Impact Statement ("EIS"). *Marsh v. Or. Nat. Resources Council*, 490 U.S. 360, 372–73 (1989). Whether an agency must complete a supplemental EIS "turns on the value of the new information to the still pending decisionmaking process." *Id.* at 374.

### 1. The Department's EIS is Sufficient under NEPA

Stand Up argues that the Department failed to consider the environmental impact of the Elk Grove acquisition. Pls.' Mot. for Summ. J. 34–38. They identify three "major deficiencies" based on the Department's review of area water supply, public safety risks, and traffic impacts. *See id.* at 46–50. The Court will consider each in turn.

#### a. The Department Considered the Project's Water Impact

Stand Up argues that the Department failed to address the effect of the Elk Grove acquisition on the Sacramento County Water Agency's ("SCWA") water capacity or "the cumulative effects of the casino project and the surrounding development." *Id.* at 47. Referencing the SCWA's 2005 Master Plan, Stand Up argues that Wilton's proposed casino will require "three times what SCWA budgeted" for the site.[5] *Id.*; *see* AR11000. As a result, Stand Up claims that the Department's mitigation measures are inadequate, and its selection of the Elk Grove site is unjustified. Pls.' Mot. for Summ. J. 47; *see* AR10703–04.

In fact, the Department thoroughly considered water supply availability. The Final EIS noted that although the Elk Grove site would have "[a] significant effect" on water distribution, "detailed water analyses" combined with appropriate mitigation measures showed that "there would be adequate water supply to serve any of the project alternatives." AR10703, AR10729. The Department also noted that the SCWA had already accounted for increased water demands at the Elk Grove site associated with other development plans. AR10729. The Final EIS concluded that the only water option for the Elk Grove site would be reliance on the SCWA but noted that the impact on water distribution facilities would be no more significant than the alternatives considered in Galt, and "less than significant" after mitigation measures. AR10704. Wilton also agreed to pay for additional water development improvements. *Id.*

---

[5] The Department and Wilton argue that Stand Up waived their arguments related to the SCWA's 2005 Master Plan because they failed to raise them during the NEPA process. *See* Fed. Defs.' Reply Mem. 19; Wilton's Reply Mem. 21; *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) ("It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review."). But the Defendants' bet ignores the fact that the Department addressed similar comments in the Final EIS. The Final EIS even referenced the 2005 Master Plan in response to a public comment challenging the Draft EIS. *See* AR10729. The Court cannot say that the Department was deprived of "a fair opportunity" to consider arguments about the SCWA's water capacity during its administrative review. *See Nuclear Energy*, 373 F.3d at 1298 (citation and formatting omitted).

Stand Up's concerns about the regional water supply are well-taken, particularly in drought-afflicted California. *See* Pls.' Mot. for Summ. J. 47. But it does not follow that the Department failed to address those concerns or, critically, that it violated NEPA. Recall that so long as the Department "adequately identified and evaluated" the environmental impacts, "the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350. The Department reviewed the water supply constraints, identified mitigation measures, including Wilton's agreement to fund improvements, and found that the SCWA would be able to meet the site's needs. AR10703.

Considering the water supply constraints in Sacramento County, it is safe to say that the Department could not find a perfect answer. But that is not what the law requires. The law does not even require "the best decision." *Salazar*, 616 F.3d at 503. It only requires "a fully informed and well-considered decision." *Vt. Yankee*, 435 U.S. at 558. The Department's analysis of water supply meets that requirement under the arbitrary and capricious review standard. *See Advocates for Hwy. & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005) ("[C]ourts are not authorized to second-guess agency rulemaking decisions; rather the role of the court is to determine whether the agency's decision is arbitrary and capricious for want of reasoned decisionmaking.").

### b. The Alleged Public Safety Impact is Not an Environmental Concern

Stand Up also argues that the Department failed to consider the public safety risk of an explosion or attack at a propane facility one-half mile from the Elk Grove site. Pls.' Mot. for Summ. J. 49. Stand Up faults the Department for failing to conduct a review in its Draft EIS altogether, and for failing to consider fully the risks in the Final EIS. *See id.*

But the risk of accident or sabotage "on an unrelated, pre-existing facility" exceeds the scope of the Department's review on this proposal. *See* Wilton's Reply Mem. 24 & n.3. "NEPA does not require the agency to assess *every* impact or effect of its proposed action, but only the impact or effect on the environment." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983) (emphasis in original). Stand Up's creative claim—that the development might make another facility a likelier, because more deadly, target for terrorists—does not transform the issue into an environmental concern. An accidental explosion or terrorist attack at the propane facility are not environmental impacts any more than they could be proximately traced to the proposed casino. *See Metro. Edison*, 460 U.S. at 774.

Yet the Department did consider the potential impact of a threat to the propane facility and concluded earlier reviews had adequately addressed the threat. *See* AR24781–82. The Department contends that contrary to Stand Up's claims, "the rule is not 'in for a dime, in for a dollar.' The Department's determination that [Stand Up's] later submissions did not change its opinion, AR24782, sufficed at a minimum because the Department did not need to respond to [Stand Up's] speculative comments at all." Fed. Defs.' Reply Mem. 21. The Court agrees. NEPA did not require the Department to assess the impacts to public safety posed by a potential terrorist attack. The Department could have omitted the review altogether without violating NEPA. So the fact that the Department did address those impacts does not create an opportunity for Stand Up to challenge the quality of the review.

### c. The Department Considered the Project's Traffic Impact

Stand Up's final "major" attack on the EIS is its failure to assess the traffic impacts of the Elk Grove site's increase from 28 proposed acres to the adopted size of 36 acres. Pls.' Mem. for Summ. J. 50. The change was based exclusively on a new parking structure after Wilton

discovered that it would not be able to share parking with an adjacent shopping mall.  AR24771–72.  The Department concluded that the gaming floor square footage, which remained unchanged, would be the driver of customer demand, and that the additional parking would "not [be] expected to affect the number of customers who will visit the proposed casino resort." AR24771.

The Court's role in this review is not to "'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor."  *WildEarth Guardians v. Jewell*, 738 F.3d 298, 308 (D.C. Cir. 2013) (cleaned up).  The Department explained why the lot needed to accommodate a new parking structure and noted that the "currently mostly paved" site would "not create any significant changes in the environmental impacts" of the Elk Grove acquisition. AR24771–72.  That is a reasonable conclusion, as is the Department's finding that the size of the gaming floor, and not the size of the parking structure, will determine customer demand at the site.  AR24771.  The Court will not "flyspeck" the Department's review over minor quibbles that the Department has considered in its reasoned decisionmaking.

### 2.  The Department was Not Required to Perform a New or Supplemental EIS

The same standard of review for agency compliance with NEPA also applies to the narrower review of an agency's obligations to prepare a new or supplemental EIS.  *Marsh*, 490 U.S. at 376.  The court is "highly deferential" to agency actions, which it presumes are valid. *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981).  And while the court's "inquiry into the facts is to be searching and careful," it "is not empowered to substitute its judgment for that of the agency."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  The "court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.*

An agency must supplement an existing EIS only if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns," or if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c). An agency need not conduct a new assessment "every time it takes a step that implements a previously studied action, so long as the impacts of that step were contemplated and analyzed by the earlier analysis." *Mayo*, 875 F.3d at 16. To require otherwise would be an exercise in superfluity.

The Supreme Court has explained that under the rule of reason, "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized." *Marsh*, 490 U.S. at 373. Rather, "a supplemental EIS must be prepared" only when a new action will affect the quality of the environment "in a significant manner or to a significant extent not already considered." *Id.* at 374.

Courts must also defer to the agency's "informed discretion" about whether to prepare a supplemental EIS because it requires "substantial agency expertise." *Id.* at 376–77. That said, "courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information." *Id.* at 378. "The overarching question is whether an EIS's deficiencies are significant enough to undermine informed public comment and informed decisionmaking." *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017).

Stand Up argues that the Department had to prepare a second EIS once Wilton applied for the Elk Grove site instead of Galt or, at a minimum, needed a supplemental EIS because of major changes to the proposed action. Pls.' Mot for Summ. J. 34. According to Stand Up, when

the Department changed "from acquiring one site for a casino to acquiring another site, [it] self-evidently made a 'substantial change[] in the proposed action.'" *Id.* (citing 40 C.F.R. § 1502.9(c)(1)(i)) (first bracket added). The Department counters that it "fully consider[ed] the environmental impacts" of the Elk Grove site in both the Draft EIS and Final EIS. Fed. Defs.' Cross-Mot. for Summ. J. 34. The Department also warns that Stand Up's argument boils down to an untenable claim that "even though an agency must consider reasonable alternatives in [a Statement], that consideration cannot be so serious as to warrant choosing one of the environmentally preferable alternatives identified in the process." *Id.* at 9.

Stand Up also lists several other shortfalls it deems "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." Pls.' Mot. for Summ. J. 34 (quoting 40 C.F.R. § 1502.9(c)(1)(ii)). These include complaints that the Department misidentified the parcel of land and failed to consider the effects of utility improvements, impacts on wastewater, the proximity of residential neighborhoods, impacts on police services and taxes, among other complaints. *Id.* at 34–36. The Department counters that Stand Up's "laundry list . . . merely flyspecks the [Draft EIS] . . . for missing minutiae and minor mistakes." Fed. Defs.' Reply Mem. 22; *see WildEarth Guardians*, 738 F.3d at 308. The Court agrees.

The Department did not have to conduct another EIS simply because it ultimately adopted the Elk Grove site over the Galt site. NEPA explicitly requires that an EIS include any potential "alternatives to the proposed action." 42 U.S.C. § 4332(c). Closely related proposals "shall be evaluated in a single impact statement." 40 C.F.R. § 1502.4. And "[t]he degree of analysis devoted to each alternative in the EIS is to be substantially similar to that devoted to the

'proposed action.'" CEQ, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026-01, 18027 (Mar. 23, 1981).

The Department did just that. From the start, it evaluated the environmental impacts of seven alternatives, including the initial proposal in Galt and the adopted site in Elk Grove. And the Elk Grove site received robust analysis in the Draft EIS and Final EIS. *See, e.g.*, AR10703–04, AR10719–20, AR11666–712, AR26979–80, AR26637, AR26985–87, AR 27142–237; Wilton's Cross-Mot. for Summ. J. 40 n.10. As the Department notes, NEPA's EIS requirements would be empty if a new or supplemental EIS was required every time an agency adopted an alternative proposal. Fed. Defs.' Cross-Mot. for Summ. J. 22. After all, the requirement to "[r]igorously explore and objectively evaluate all reasonable alternatives" lies at "the heart of" the EIS. 40 C.F.R. § 1502.14. Stand Up's proposal would require the Department—and every other federal agency—to repeat this analysis for every alternative proposal it adopts. There is no basis for such a rule in logic or in the law. *See* 42 U.S.C. § 4332(c).

More, the Department did not define the Galt site as the proposed action; Wilton's application to the Department did. Fed. Defs.' Cross-Mot. for Summ. J. 22, 23 & n.14; *see also* 46 Fed. Reg. at 18028 ("the proposed action may be granting an application to a non-federal entity for a permit. The agency may or may not have a 'preferred alternative' at the Draft EIS stage . . . ."). It would be perverse to hold against the Department a designation that it did not control. In any event, the delineation of preferred and alternative proposals is inconsequential when an agency properly analyzes each, and the Department did that. *See* 42 U.S.C. § 4332(c).

And Stand Up's "laundry list" of other complaints also fails to paint a "*seriously* different picture of the environmental landscape" that would require a supplemental EIS. *See City of Olmstead Falls v. FAA*, 292 F.3d 261, 274 (D.C. Cir. 2002) (emphasis in original). Stand Up

cannot raise these issues in a passing fashion and expect the Court to invalidate the Department's entire review. *Cf. Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 205 (1st Cir. 1999) (noting arguments raised "in a perfunctory manner, unaccompanied by some effort at developed argumentation" are waived when they "do not attempt to explain the manner in which the environment will be significantly affected"). More, many of Stand Up's criticisms are entirely misplaced because the Department analyzed the issues in its Draft EIS. *See, e.g.*, AR26513–15, AR26610–15, AR26616–27, AR26637, AR26690–93, AR26853–54, AR26878–82, AR26979–88; Fed. Defs.' Cross-Mot. for Summ. J. 39. The Department was not required to complete a supplemental EIS solely because it analyzed the issues in greater detail in the Final EIS than it did in the Draft. *See Marsh*, 490 U.S. at 374.

The Department took "a 'hard look' at the environmental consequences of its actions, including alternatives to its proposed course." *See Sierra Club*, 867 F.3d at 1367. Stand Up has identified no compelling analytical or legal deficiencies in that "hard look," let alone evidence that the Department's review was arbitrary or capricious. NEPA not only contemplates that an agency may select an alternative proposal, it demands that an agency look at the alternatives. *See* 42 U.S.C. § 4332(c).

That is what happened here. The EIS considered the Elk Grove site's impacts on the quality of the environment. *See Marsh*, 490 U.S. at 374. Considering the Department's environmental review, particularly under the deferential arbitrary and capricious standard, Stand Up has not shown that the Elk Grove site presented significant environmental impacts that the Department failed to consider. *See id.* To the contrary, the record shows a thorough and comprehensive environmental review of each of the alternatives, including the Elk Grove site.

The Court is satisfied that the Department made a "reasoned decision" not to complete a new or supplemental EIS.  *See id.* at 378.

Stand Up's reliance on *Lemon v. McHugh,* 668 F. Supp. 2d 133 (D.D.C. 2009), fares no better than their other arguments.  *See* Pls.' Mot. for Summ. J. 37.  Stand Up argues that *Lemon* compels the Department to perform a more thorough evaluation before deciding not to complete a supplemental EIS.  Pls.' Mot. for Summ. J. 37.  But in *Lemon*, the Final EIS came six years before the plan was ultimately approved.  668 F. Supp. 2d at 136.  The court was not convinced that the agency had fully considered the overall environmental impact of the project.  *Id.* at 140.  In contrast to that stale review, here the Department conducted a thorough analysis in the Draft EIS and added to it in the Final EIS, rendering a supplemental review unnecessary.  *See Olmsted Falls*, 292 F.3d at 274 (no need for supplemental EIS where "there simply is not significant new information, and the landscape is unchanged").  NEPA requires a "hard look," but it does not require "a *new* look every time [an agency] takes a step that implements a previously-studied action."  *Mayo*, 875 F.3d at 14–15 (emphasis in original).  The unique facts in *Lemon* do not compel a supplemental EIS in this case.

This also follows other courts' decisions to upheld agency discretion in this area.  *See*, *e.g.*, *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004) ("[T]he Commission's determination that the new information was not significant enough to warrant preparation of a supplement to the [Draft EIS] is entitled to deference."); *Friends of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1097 (10th Cir. 2004) ("The Agency has determined a supplemental EIS is not required where the ROD selects an option not identified as the preferred option in the final EIS, as long as the selected option was fully evaluated. . . . [W]e conclude that the Agency's failure to issue a supplemental EIS in this case was not arbitrary or capricious.").

Stand Up's insistence on another EIS demands too much of the Department on this record.  The Department acted well within its discretion, and the Court cannot say that the EIS was so deficient as to "undermine informed decisionmaking."  *See Sierra Club*, 867 F.3d at 1368.

### 3. The Timing of the Decision Does Not Show Impermissible Predetermination

Stand Up claims that the Department's rush to a decision before the 2017 presidential inauguration is evidence that it had "predetermined its outcome," and that it raced to a decision "apparently because it assumed that the incoming Administration would be less friendly."  Pls.' Mot. for Summ. J. 38–39.  The Department's dash to issue its decision may be suspicious, but upon review of the record, the Court finds that it complied with NEPA and the APA.

Stand Up's argument to the contrary relies heavily on *North Carolina Alliance for Transportation Reform, Inc. v. U.S. Department of Transportation*, 151 F. Supp. 2d 661 (M.D.N.C. 2001).  In that case, a district court inferred that the Department of Transportation acted in bad faith when it issued its ROD only one day after the Final EIS.  *Id.* at 676.  The very quick turnaround is similar here, where the Department issued its ROD just two days after the close of comments on the Final EIS.  *See* Pls.' Mot. for Summ. J. 16.  And that is arguably "alarming, especially in light of the crawling pace at which administrative agencies typically conduct their business."  *See Alaska v. U.S. Dep't of Agric.*, 273 F. Supp. 3d 102, 118–19 (D.D.C. 2017).

But important differences also distinguish this case from *North Carolina Alliance*.  For one, the agency in that case acknowledged that it received and left unanswered "numerous comments" to the Final EIS before issuing the ROD.  *N.C. Alliance*, 151 F. Supp. 2d at 676.  And before the court's review in that case, the agency had already re-opened "the entire NEPA process" in an implicit admission of a flawed process.  *Id.*  Finally, the court's inquiry was about

an award of attorney fees and expenses, not whether the Department violated NEPA. *Id.* In all, the court found that the agency "would not have issued the ROD so rapidly had they undertaken a more deliberate consideration of the environmental analysis." *Id.*

While a two-day turnaround between the close of public comments and issuance of the ROD is highly unusual, that alone does not prove a NEPA violation. Consider the principle in another case, *Alaska v. U.S. Department of Agriculture*:

> Alaska seems to want this Court to presume that, because the USDA conducted such a far-reaching rulemaking in an extraordinarily short time period, the USDA *necessarily* did not satisfy NEPA's goals of adequate public disclosure and informed decision-making. Indeed, the fact that the USDA issued a rule affecting a whopping 2 percent of all land in the United States in less than 15 months is alarming, especially in light of the crawling pace at which administrative agencies typically conduct their business. But upon review of the record herein, I find that the USDA complied with NEPA in conducting its public comment and decisionmaking processes.

273 F. Supp. 3d at 118–19 (emphasis in original).

So too here. Despite Stand Up's claim that the Department compressed a 15-month process into 40 hours, *see* Pls.' Mot. for Summ. J. 40,[6] the extensive administrative record shows that the Department spent sufficient time and energy analyzing the many contours of its acquisition decision. Not only that, but the Department received only eleven letters during the Final EIS comment period, and only four of them on the final day for submission. AR24530; Fed. Defs.' Cross-Motion for Summ. J. 41. It is certainly reasonable to conclude that the Department addressed the substantive concerns in those letters before issuing its ROD. And although Stand Up points to internal Department emails seeking "a very quick review" and correspondence showing intent to "allow land to be put into trust by January 19, 2017," Stand Up

---

[6] The 15-month calculation is a dubious one, anyway. *See* Fed. Defs.' Reply Mem. 18 n.9 ("Plaintiffs' assertion that an agency ROD should take fifteen months to issue is of their own concoction.").

cites no unanswered public comment or evidence that the Department's decisionmaking process was flawed. *See id.* at 41–42; AR5791, AR5627.

Time aside, an agency engages in impermissible predetermination when it "*irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome." *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 70 (D.D.C. 2012) (citation omitted) (emphasis in original). But the Department may work toward a solution, even its preferred one. "Bias towards a preferred outcome does not violate NEPA so long as it does not prevent full and frank consideration of environmental concerns." *Cmte. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 206 (D.D.C. 2015); *see also Envtl. Def. Fund, Inc. v. Corps of Engineers*, 470 F.2d 289, 295 (8th Cir. 1972) (holding NEPA requires agencies "to objectively evaluate their projects," but does not require "agency officials to be subjectively impartial"). Concluding that a quick turnaround proves a *per se* violation of NEPA is not only legally incorrect, it is also illogical. The Department's response is instructive: If "two days is, as a matter of law, too short to take a hard look under NEPA," then "it is unclear what the agency is supposed to do on remand except wait longer. And if that is the case, exactly how long should the agency wait?" Fed. Defs.' Reply Mem. 18–19.

Stand Up's failure to marshal any evidence of bad faith is not for lack of opportunity. In a previous ruling and in light of the unusual sequencing of events here, the Court directed the Department to provide Stand Up with additional discovery and the Department's privilege log. *See* Order, May 30, 2018, ECF No. 63.[7] Yet this extraordinary discovery did not present any

---

[7] In the same Order, the Court also denied the part of Stand Up's motion seeking to supplement the administrative record. *See* Order, May 30, 2018. Among other documents, Stand Up wanted a March 6, 2017 SCWA memorandum added to the record, a request they have renewed in a Motion for Reconsideration. *See* Pls.' Mot. to Supp. the Admin. Rec. and for Disc., ECF No. 57; Pls.' Mot. for Recons., ECF No. 87. But as the Court noted, the memorandum post-dates the Department's decision and there was no evidence that the Department had notice of the document at the time. *See* Mem. Op., May 30, 2018 at 8, ECF No. 62. In its request for reconsideration, Stand Up concedes that "the memo was not before the Department during the decision-making process." Pls.' Mot. for

new evidence of bad faith. *See* Pls.' Mot. for Summ. J. 38–39. In this regard, it is notable that—despite being almost three years into the new Administration—the Department's leaders have not made any effort to repudiate or undermine the decisions made in this case by their predecessors.

The lack of evidence of bad faith suggests another, more plausible explanation for the rush: the outgoing leadership team wanted to "clear the decks" of unfinished business before their departure. While this instinct *might* be motivated by a desire to "bind the hands" of incoming political appointees, it can also spring from a sense of obligation and good governance to finish projects that are nearly complete while the decisionmakers who are most knowledgeable about the project are still in office. Stand Up has not provided any reason to believe that such a motivation would be invalid.

And that is not all. Stand Up's insinuations of impropriety run up against a strong "presumption of regularity" afforded to executive branch agencies. *See Overton Park*, 401 U.S. at 415. Earlier this year, the Supreme Court emphasized that reviewing courts "may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *New York*, 139 S. Ct. at 2573. More specifically, "a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities. . . . Such decisions are routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)." *Id.* In practice, courts "give the benefit of the doubt to the agency." *Id.* at 2580 (Thomas, J. dissenting). This Court must follow suit. While the Department worked around the clock to

Recons. 4. Thus, for the same reasons listed in the May 30, 2018 Memorandum Opinion, the Court will deny Stand Up's Motion for Reconsideration. *See* Mem. Op., May 30, 2018 at 8.

issue its decision before President Trump's inauguration, the Court will not impute improper motives when other considerations were likely at play.

### 4. The Public Appropriately Participated in the Department's Selection Process

Finally, Stand Up argues that the Department withheld information about the Elk Grove site that deprived the public of a meaningful opportunity to participate in the selection process. *See* Pls.' Mot. for Summ. J. 26. The record tells a different story. *See* Fed. Defs.' Cross-Mot. for Summ. J. 26–33.

The Department first published notice of the Elk Grove site in the 2014 EIS Scoping Report, which identified the site as Alternative F. AR16278, AR24777. The Scoping Report included maps and diagrams of each of the alternatives, including Elk Grove. AR16282–83, AR16289, AR16291. The December 2015 Draft EIS also included Alternative F and "analyzed in great detail all of the alternatives and their environmental impacts, including Alternative F, in over 700 pages." *See* Fed. Defs.' Cross-Mot. for Summ. J. 26; *see*, *e.g.*, AR26360–61. The Department published a Notice of Availability for the Draft EIS in the Federal Register, which included key information about the proposal and the public comment process. 80 Fed. Reg. 81352-02 (Dec 29, 2015). And to make it more accessible, the Department also published the Notice of Availability in three area newspapers. AR12527–29. Then, after 60 days for public comment, Wilton's Chairman announced at a public hearing that "Alternatives A and F, Elk Grove, are the tribe's preferred alternatives." AR431.

And the public notice only expanded from there. Wilton revised its fee-to-trust application in June 2016, requesting the Elk Grove site over the Galt location. AR13215. Wilton then held a "town-hall-style meeting" with the public to "present its plans to the community, solicit comment and respond to questions and concerns." AR12558. Then toward

the end of 2016, the Department issued the Final EIS, which listed the Elk Grove site as the preferred alternative. AR10957, AR10964. Like the Draft EIS, the Department published the Final EIS in the Federal Register and local newspapers. *See* AR24768; 81 Fed. Reg. 90379-01 (Dec 14, 2016). Surely the public knew that the Elk Grove site was under consideration.

And it was not only the extent of the notice that suggests the public was aware of the possibility. The number of public comments in the record referencing the Elk Grove site show that the public knew it was an option. *See* Fed. Defs.' Cross-Mot. for Summ. J. 27 (citing record). Notable commenters included the City of Elk Grove, AR10290; Sacramento County, AR10447–48; and the EPA, AR10310 (recommending the Elk Grove site "be designated the environmentally preferable alternative"). But individual citizens commented as well. Indeed, Plaintiff Lynn Wheat encouraged the Department to "consider carefully" the Elk Grove site *instead* of the Galt site. AR10677. It strains the limits of credulity for Stand Up to argue that the public was unaware Lynn Wheat might get her wish. The Court will grant summary judgment to the Defendants as to Count V.

## IV.    CONCLUSION

Finding no evidence of a legal or procedural flaw in the Department's decisionmaking processes, and for all the reasons stated above, the Court will deny Stand Up's motion for summary judgment and grant the Department's and Wilton's motions for summary judgment.[8] A separate Order will issue.

Dated: October 7, 2019

TREVOR N. McFADDEN, U.S.D.J.

---

[8] The Court has considered the parties' requests for a motions hearing but finds oral argument unnecessary here. *See* LCvR 78.1.